**BUILDERS FEDERAL (HONG KONG) LTD., and Josef Gartner & Co., Plaintiffs,**

v.

**The TURNER CONSTRUCTION, Turner Construction Company and Turner International Industries, Incorporated, Defendants.**

No. 87 Civ. 0489–CSH.

United States District Court, S.D. New York.

March 20, 1987.

Debevoise & Plimpton, New York City, for plaintiffs; Roger E. Podesta, David W. Rivkin, Edward M. Roth, T. Edward Tighe, Anne E. Cohen, of counsel.

Seyfarth, Shaw, Fairweather & Geraldson, New York City, Washington, D.C., Chicago, Ill., for defendants; Andrew R. Laidlaw, Richard C. Johnson, Michael L. Hirschfeld, Bennett Greenberg, Timothy J. McInnis, Lise S. Rubenfeld, Kevin P. Connelly, and Joseph V. Vumbacco, Senior Vice President, Secretary and Gen. Counsel The Turner Corp., New York City, of counsel.

HAIGHT, District Judge:

This is a petition to compel arbitration of commercial disputes.

Plaintiff Builders Federal (Hong Kong) Ltd. is a Hong Kong corporation. Plaintiff

Josef Gartner & Co. is a West German corporation. The three defendants are American corporations (two incorporated in Delaware, one in New York).

Plaintiffs formed a joint venture in order to bid for certain subcontract work in respect of the construction of twin office buildings in Singapore. The project is called "The Gateway."

The Gateway's developer is Gateway Land Pte. Ltd. ("Gateway Land"), a Singapore corporation. The main contractor for the project was Turner (East Asia) Pte. Ltd. ("TEA"), a Singapore corporation and a wholly-owned subsidiary of defendant Turner International Industries, Inc.

Plaintiffs, having successfully applied to Gateway Land for appointment as one of the project's subcontractors, entered into a subcontract with TEA at Gateway Land's instructions.

Both the main contract between Gateway Land and TEA (hereinafter the "main contract") and the subcontract between TEA and plaintiffs provide for arbitration of all disputes in Singapore. In addition, clause XXII of the subcontract in pertinent part provides that:

"... if the dispute or difference between the Contractor and the SubContractor is substantially the same as a matter which is a dispute or difference between the Contractor and the Employer under the Main Contract the Contractor and the Sub-Contractor hereby agree that such dispute or difference shall be referred to arbitration pursuant to the terms of the Main Contract."

The extensive motion papers and affidavits show that construction of the Gateway has come to a halt. TEA, as main contractor, first suspended and then terminated work on the project. This automatically suspended and then terminated work under all the subcontracts, including that of plaintiffs. TEA blames Gateway Land for the termination. Gateway Land blames TEA.

Various litigation and arbitration proceedings have been commenced in Singapore. One of these is an application by plaintiffs to compel TEA to arbitrate plaintiffs' claim arising out of their subcontract before an arbitrator in Singapore. TEA's position is that under the contractual language I have quoted, plaintiffs are required to refer their claims to the arbitration under the main contract, which is proceeding through its preliminary stages. That procedural contention by TEA is currently *sub judice* before a Singapore court.

Plaintiffs petition this court to compel the present defendants, TEA's collective corporate parents, to arbitrate plaintiffs' claims against TEA. Plaintiffs contend that defendants should be regarded as the "alter egos" of TEA.

Subject matter jurisdiction in this court is said to be founded upon the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "Convention"), 21 U.S.T. 2517, T.I.A.S. No. 6997.

Defendants move to dismiss the petition, or in the alternative, for a stay of all proceedings thereunder pending arbitration and litigation in Singapore. Plaintiffs move for expedited discovery in aid of their petition.

The status of the arbitration and litigation in Singapore require that this Court act as quickly as possible. Whatever this Court does, the magnitude of the amounts involved and the complexity of the issues suggest the likelihood of an appeal.[1]

Accordingly I have given the case priority, and state the reasons for my conclusions in relatively summary form. Exigencies take precedence over art.

## I.

### Subject Matter Jurisdiction

Plaintiffs' petition seeks two forms of relief: (a) an order directing defendants "to

---

1. An appeal lies under 28 U.S.C. § 1291 from an order compelling arbitration under 9 U.S.C. § 4, *N.V. Maatschappij Voor Industriele Waarden v. A.O. Smith Corp.*, 532 F.2d 874 (2d Cir.1976). Where, as here a section 4 petition is brought in an independent proceeding, an appeal also lies under § 1291 from an order denying the petition to compel arbitration. *Langley v. Colonial Leasing Co. of New England*, 707 F.2d 1, 4 (1st Cir.1983).

proceed forthwith to an arbitration" of the disputes between them and TEA; and (b) a declaration that defendants are bound to so arbitrate. While the petition does not say so explicitly, plaintiffs' brief in opposition to defendants' motion to dismiss shows that plaintiffs ask this Court to direct defendants to arbitrate in Singapore. *Id.* at 55.

Defendants challenge this Court's subject matter jurisdiction to grant that relief.

The second form of relief is cast in terms of the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, which plaintiffs cite in the petition's preamble. The Declaratory Judgment Act, while providing a remedy where appropriate, is not an independent basis for subject matter jurisdiction. Plaintiffs recognize this. They allege jurisdiction under (a) § 1332 diversity, and (b) the Convention. If this court is empowered to direct defendants to arbitrate with plaintiffs in Singapore, that power is derived only from the Convention. Thus the Convention is crucial to subject matter jurisdiction.

Defendants draw a distinction between "offensive" and "defensive" petitions to compel arbitration. The petition at bar is "offensive" (and not just in the sense that defendants find it unwelcome): Plaintiffs, by commencing the action, take the offensive in compelling arbitration. A "defensive" petition arises when a party to a contract containing an arbitration clause sues the other party in court. The defendant responds with a "defensive" petition to stay the suit and compel arbitration.

Defendants say that the Convention authorizes defensive petitions but not offensive ones.

If defendants are correct, the Convention as implemented by Congress in Chapter 2 of the Federal Arbitration Act (the "Act"), 9 U.S.C. § 201 *et seq.*, lacks the remedial breadth of Chapter 1. In respect of agreements to arbitrate in the United States, Chapter 1 of the Act explicitly authorizes petitions both defensive, 9 U.S.C. § 3, and offensive, § 4.

Defendants recognize that a number of lower Federal Courts have entertained "of-fensive" petitions to compel arbitration under the Convention and Chapter 2 of the Act. Some, though not all, of those decisions are cited at 19–20 of defendants' main brief. We must add to that collection the Supreme Court's recent decision in *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985), to which defendants refer in a different context. *Mitsubishi* began as a Japanese company's petition under the Convention and Act, filed in Federal Court in Puerto Rico to compel a Puerto Rican company to arbitrate in Japan under the terms of their contract. The Supreme Court held, reversing the Court of Appeals, that the Puerto Rican company's federal anti-trust counterclaims must be arbitrated in Japan, although earlier federal appellate decisions regarded anti-trust claims as nonarbitrable domestically.

The present defendants' theory, if correct, would have deprived the federal courts of subject matter jurisdiction in *Mitsubishi:* a defect which escaped the attention of counsel, the District Court, the Court of Appeals and the Supreme Court.

But defendants say their jurisdictional argument has never been previously raised or analyzed. That appears to be true. Subject matter jurisdiction lies at the heart of a trial court's ability to do anything. Defendants properly raise the issue in this case.

■ Having said that, I conclude an "offensive" petition to compel arbitration abroad properly lies in this Court under the Convention as implemented by Chapter 2 of the Act.

Defendants contend that the Convention is the only pertinent "substantive legal enactment", the Act being limited to "jurisdictional and procedural authorizations." Main brief at 11. From that preface, defendants focus upon Article II(3) of the Convention, which provides:

"3. The court of a Contracting State, when seized of an action in a matter in respect of which the parties have made an agreement within the meaning of this

article, shall, at the request of one of the parties, refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed."

The case for defendants is that a court is "seized of an action" under the Convention *only* when a party to a written arbitration agreement covered by Article II(1)[2] commences a plenary suit against the other party in derogation of the agreement. Article II(3) does no more than to empower the court, in such circumstances, to grant a "defensive" petition and "refer the parties to arbitration."

I cannot accept that submission. The Act provides that the Convention "shall be enforced in United States courts in accordance with" Chapter 2. 9 U.S.C. § 201. Section 203 provides:

"An action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States. The district courts of the United States (including the courts enumerated in section 460 of title 28) shall have original jurisdiction over such an action or proceeding, regardless of the amount in controversy."

Section 206 provides:

"A court having jurisdiction under this chapter may direct that arbitration be held in accordance with the agreement at any place therein provided for, whether that place is within or without the United States. Such court may also appoint arbitrators in accordance with the provisions of the agreement."

Section 208 provides:

"Chapter 1 applies to actions and proceedings brought under this chapter to the extent that that chapter is not in conflict with this chapter or the Convention as ratified by the United States."

The Convention was adopted at the conclusion of a United Nations conference held in New York from May 20 to June 10, 1958.

The "legislative history" of such enactments tends to be less structured than that preceeding an act of Congress. Defendants seize upon certain drafts and comments of conference delegates and others in support of the restrictive construction they place upon Article II(3)'s phrase "when seized of an action."

The Convention entered into force on June 7, 1959. Numerous countries promptly adhered to it. The United States participated in the conference but did not sign the Convention at the time "because the American delegation felt that certain provisions were in conflict with some of our domestic laws." H.Rep. No. 91–1181, 1970 U.S.Code Cong. and Admn.News at 3601 (accompanying the bill which became Chapter 2 of the Act). However, increasing support for the Convention, both within and without the United States Government, led to accession. The Senate approved the Convention in October 1968. Chapter 2 of the Act, drafted to implement the Convention, was passed on July 31, 1970 and became effective when the United States thereafter deposited its instrument of accession to the Convention.

In a declaration accompanying its accession to the Convention, the United States limited the Convention's application "to differences arising out of legal relationships, whether contractual or not, which are considered as commercial under the national law of the United States." Notes following Convention printed at 9 U.S.C. § 201 (West 1986) at 213. Within that limitation, which does not exclude the commercial contract at bar, Congress intended the broadest possible implementation of the Convention. Thus the Act, in addition to setting up procedural and jurisdictional machinery for the Convention, also provides in § 208 that Chapter 1 of the Act applies to proceedings brought under Chapter 2, to the extent that Chapter 1 is "not in conflict" with Chapter

---

**2.** Article II(1) provides:

"1. Each Contracting State shall recognize an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen or which may

arise between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration."

2 or with the Convention as ratified by the United States.

I have noted that 9 U.S.C. § 4, which forms a part of Chapter 1, specifically provides for an "offensive" petition to compel arbitration. Thus, in *Mitsubishi, supra,* Supreme Court in describing the procedural history of the case said at 3350:

> "Mitsubishi sought an order, pursuant to 9 U.S.C. §§ 4 and 201, to compel arbitration" in accordance with the parties' agreement.

At 3350 n. 3, the Court in *Mitsubishi* then set out what it regarded as the pertinent statutory and Convention provisions. The Court quotes from 9 U.S.C. § 4, which establishes the right to petition to compel arbitration; § 201, which provides that the Convention "shall be enforced in United States Courts in accordance with" Chapter 2; and Article II(1) and (3) of the Convention (the latter sub-article containing the language which the present defendants say limits petitions under the Convention to defensive ones.)

Plaintiffs at bar are entitled to invoke section 4 of the Act, within the framework of the Convention, unless defendants demonstrate that section 4 is "inconsistent" with Article II(3) of the Convention. The defendants do not persuade me of this. In my view, a court of a Contracting State becomes "seized of an action" under the Convention when a party to a written arbitration agreement seeks to compel arbitration in accordance with any procedures available under the internal laws of the Contracting State where enforcement is sought.

Given the Supreme Court's repeated recognition of American public policy favoring arbitration, as embodied in the nation's adherence to and implementation of the Convention (*Mitsubishi* being only the most recent such declaration), I decline to be the first American judge to impose so significant a limitation upon the Convention's remedies.

As for the Act, plaintiffs point to testimony before the Senate Foreign Relations Committee demonstrating that "offensive" proceedings to compel arbitration were specifically contemplated as the result of United States adherence to the Convention. McMahon, *Implementation of the United States Convention on Foreign Arbitral awards in the United States,* 2 J.Mar.L. & Com. 735, 748–49 (1971).

Accepting that no federal court has previously been asked to consider its power to entertain an offensive petition to compel arbitration abroad under the Convention and the Act, the repeated exercise of that power by federal courts suggests, at the very least, that they do not lack subject matter jurisdiction to entertain the proceeding. Defendants at bar invite this Court to be the first to declare that such a petition does not lie. For the reasons stated, I decline the invitation, and hold that subject matter jurisdiction exists in this case.

## II.

### *The Viability of Plaintiffs' Claim.*

Assuming jurisdiction exists (as it does), defendants move under Rule 12(b)(6) to dismiss the petition and complaint for failure to state a claim upon which relief can be granted.[3]

The parties have submitted a barrage of affidavits, which if considered by the court would transform defendant's motion to one for summary judgment under Rule 56. The affidavits raise a plethora of disputed fact issues which make summary judgment inappropriate. Accordingly the question is whether plaintiffs' pleading passes muster under Rule 12(b)(6). In applying that rule, I take plaintiffs' well-pleaded allegations as true, and can dismiss the petition only if it appears on the face of the pleading that plaintiffs can prove "no set of facts" in support of their claim which would entitle them to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957).

---

**3.** Defendants also move to dismiss the petition for failure to join necessary parties under Rule 19. In the view I take of the case, this contention need not be considered at length. *See* fn. 4 *infra.*

■ Judged by that demanding criterion, defendants' motion to dismiss the petition fails. The petition states a viable claim that defendants should be compelled to join an arbitration in Singapore of disputes between plaintiffs and TEA.

The briefs of counsel debate at some length just what claims plaintiffs are asserting. Plaintiffs' basic premise, I think it fair to say, is that defendants are liable for TEA's contractual obligations (including the obligation to arbitrate) because TEA is their alter ego. Defendants, for their part, appear to characterize the plaintiffs' theory as one of implied guaranty of TEA's performance. Both theories of liabilities may, in appropriate circumstances, support an order to compel arbitration. *See, e.g., Fisser v. International Bank*, 282 F.2d 231 (2d Cir.1960) (alter ego); *Compania Espanola de Petroleos S.A. v. Nereus Shipping, S.A.*, 527 F.2d 966, 973–74 (2d Cir.), *cert. denied* 426 U.S. 936, 96 S.Ct. 2650, 49 L.Ed.2d 387 (1976) (written contract of guaranty).

To the extent that the present plaintiffs' theory is properly characterized as one of guaranty, and to the extent that New York law governs, a question arises under the Statute of Frauds, N.Y. General Obligations law § 5–701(2) (McKinney 1978). Generally, one party's guarantee of another's performance must be in writing to satisfy the Statute of Frauds. *Interocean Shipping Co. v. National Shipping & Trading Corp.*, 462 F.2d 673, 678 (2d Cir. 1972). However, such a promise fraudulently given, with no present intention of performing, falls outside the statute, which the courts decline to "use as a shield for wrongdoers". *Fort Howard Paper Co. v. William D. Witter, Inc.*, 787 F.2d 784, 790 (2d Cir.1986).

But I need not further pursue this particular issue, which the parties do not address in their briefs in any event. It is clear that plaintiffs state a viable claim under the alter ego theory.

The petition is replete with allegations that defendants exercised dominance and control over TEA, and that TEA was under-capitalized. Those allegations are not sufficient of themselves to "pierce a corporate veil" so as to visit upon parent corporations the obligations of a subsidiary. *Walkovszky v. Carlton*, 18 N.Y.2d 414, 276 N.Y.S.2d 585, 223 N.E.2d 6 (1966). But the petition alleges more than that. It alleges that the subcontract between plaintiff's and TEA obligated TEA to make certain payments to plaintiffs upon termination of the main contract; and that defendants decided that TEA would breach those obligations, sending implementing instructions to TEA. Petition, ¶ 38. These allegations, even in the absence of allegations of fraud requiring Rule 9(b) particularity, are sufficient to state a claim for alter ego liability. *Gorrill v. Iceland Air/Flugleidir*, 761 F.2d 847, 853 (2d Cir.1985) (construing New York law).

The petition states a viable claim falling within this Court's subject matter jurisdiction.

### III.

*Defendants' Request for a Stay.*

In the alternative, defendants ask that proceedings in this Court be stayed pending completion of the arbitration proceedings in Singapore. I will grant that application, subject to the conditions set forth below.

9 U.S.C. § 4 provides that:

"If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof."

When the existence of any agreement obligating anyone to arbitrate anywhere is at issue, then by definition the section 4 trial must preceed the arbitration. But that is not necessarily so when an arbitration agreement concededly exists, undisputedly binding named parties to arbitrate, and the section 4 petitioner claims that non-signatories to the contract are also bound to arbitrate. In those circumstances an arbitration will in any event take place between the named parties to the contract. If the prevailing party's award is not satisfied by the other party, the prevailing par-

ty may subsequently proceed against the non-signatory, either as guarantor of the named party's obligations or on an alter ego theory. *Orion Shipping & Trading Co., Inc. v. Eastern States Petroleum Corporation of Panama, S.A.,* 312 F.2d 299, 301 (2d Cir.1963). The precise holding in *Orion* is that a proceeding to confirm an award of arbitrators under section 9 of the Act, a limited proceeding, is "not the proper" time for the District Court to consider "piercing the corporate veil" of the parent. But the Second Circuit's more general holdings, to which I have just referred, prompted Judge Carter of this Court in *Cochin Refineries Ltd. v. Triton Shipping Inc.,* S.D.N.Y. 74 Civ. 216 (decided March 19, 1974), to stay a corporate veil piercing effort until resolution of the arbitration between the named parties. Judge Carter wrote:

> "If plaintiff prevails against Triton at arbitration, and the latter is unable to satisfy the judgment award, plaintiff's action against the other defendants will still be pending. It will be time enough at that time for a trial to determine whether these defendants are bound."

For that proposition, Judge Carter cited *Orion* by comparison.

I declined to follow Judge Carter's lead in *Hidrocarburos y Derivados, C.A. v. Lemos,* 453 F.Supp. 160, 173–74 (S.D.N.Y. 1977). But in that case, the non-signatory party flatly declared that it would not be bound by any award in the arbitration involving the company for whose performance the non-signatory party was said to be liable. Furthermore, the signatory party was pressing affirmative claims against the section 4 petitioner. 453 F.Supp. 174 at n. 31. In those circumstances, it seemed to me right to direct that New York arbitrators determine in advance of the arbitration whether the non-signatory parties would be fully bound by the arbitration, both in respect of an obligation to arbitrate and the quantum of the arbitrators' award. The Second Circuit adopted a similar rationale in *Fisser v. International Bank, supra.*

■ In the case at bar, were I to "proceed summarily" at this time to the trial of plaintiffs' petition, it would have a disruptive effect upon the pending judicial and arbitral procedings in Singapore, the agreed-upon situs of the arbitration. Plaintiffs' brief seeks to minimize that disruption, but it appears to me both real and significant. Plaintiffs' discovery demands in aid of its alter ego theory are far-reaching, in respect of both document production and answers to interrogatories. The taking of depositions of TEA and defendants' officers and employees cannot be far behind. I say this not in criticism of the litigation tactics of plaintiffs' counsel here, but in recognition that such litigation would in all likelihood disrupt and delay the rather stringent procedural deadlines imposed by Mr. Gardam, the Singapore arbitrator. In addition, the Singapore court is currently considering whether plaintiffs are required to submit their claims as part of the arbitration under the main contract, or are entitled to a separate arbitration against TEA. This Court's order, adding three additional corporate parties to the Singapore proceedings, would constitute an intrusive action against which comity counsels.

Quite apart from these considerations, resolution of the issues in the Singapore arbitration may well limit or narrow the issues here. That is a sufficient basis for this Court to exercise its inherent power "to control the disposition of the cases on its docket with economy of time and effort for itself, for counsel and for litigants." *Hikers Industries v. William Stuart Industries,* 640 F.Supp. 175, 177 (S.D.N.Y. 1986), citing and quoting *Landis v. North America Co.,* 299 U.S. 248, 254–55, 57 S.Ct. 163, 163–66, 81 L.Ed. 153 (1936) (suit by sublicensee against retailer for trademark infringement stayed pending arbitration between sublicensee and licensee). There is ample authority in this circuit for staying suits here on alleged guarantees given by corporate parents pending arbitration abroad between plaintiff and subsidiary. *Nederlandse Erts-Tanker-Smaatschappij, N.V. v. Isbrandtsen Company,* 339 F.2d 440 (2d Cir.1964), and subsequent orders reported at 362 F.2d 205 (2d Cir 1966) and 387 F.2d 954 (2d Cir 1968).

The concerns this Court addressed in *Hidrocarburos, supra,* are alleviated by the present defendants' willingness, expressed through counsel, to waive any "due process" arguments arising out of their desired non-participation in the Singapore arbitration. I will exact that undertaking as a condition for a stay of these proceedings. Meaning no disrespect to counsel, the undertaking must take the form of corporate resolutions in proper form, given by each of the three corporate defendants. Those resolutions must set forth the defendants' agreements that if plaintiffs prevail on the merits of the petition at bar, defendants will regard themselves as bound by any award rendered in the Singapore arbitration against TEA, as to merits and quantum, precisely as if defendants had participated in that arbitration as parties from its inception. Counsel for defendants are directed to settle the text of such corporate resolutions on notice before they are executed.

In addition, this court directs in an exercise of its equitable powers that the defendants take no steps which would hamper the progress of the Singapore arbitration, or serve to impede its completion within a reasonable time. In making that direction, I do not mean to preclude such litigation steps as TEA may be advised by their Singapore counsel to pursue. My focus will be upon possible bad-faith obstructionism generated by the corporate parents. *Cf. Nederlandse, supra,* at 339 F.2d 442. In saying this I do not suggest that I anticipate such obstructionism. But I wish the scope of this Court's equitable order to be clear.

On these terms and conditions and in the exercise of my discretion, I grant a stay of proceedings under the petition and complaint, including discovery.[4]

The Clerk of the Court is directed to place this case on the Suspense Docket, pending further Order.

The foregoing is SO ORDERED.

---

**4.** This stay of proceedings renders unnecessary a detailed discussion of defendants' alternative ground for dismissal of the petition, namely, failure to join necessary parties under Rule 19. Defendants argued that TEA was a necessary party to plaintiffs' alter ego theory against the corporate parents; and that the Singapore arbitrators "and other participants" in the Singapore arbitration were also necessary parties under Rule 19(a). Main brief at 46. To the extent that the subsidiary should be regarded as a necessary party in the effort to visit liability upon the corporate parents, the proper remedy would be joinder rather than dismissal of the petition.

Plaintiffs' papers appear to allege a sufficient basis for personal jurisdiction over TEA in this district. Defendants' suggestion that the arbitrators and other parties to the Singapore proceedings are necessary for a fair adjudication of the plaintiffs' claims seems to me entirely fanciful. But the conditional stay of proceedings ordered herein moots these issues as a practical matter. The merits of the petition at bar will be pursued only if the Singapore arbitration results in an award in plaintiffs' favor against TEA which TEA fails to pay. Within that particular context, the joinder concerns which defendants profess do not arise.